EVA K. CONLON, Respondent, *v.* JAMES H. MARSH and Another, Appellants, Impleaded with LAWYERS TITLE INSURANCE AND TRUST COMPANY, Defendant.

First Department, January 16, 1920.

**Dower — fraud — suit to set aside assignment of dower on ground that it was procured by false and fraudulent representations — evidence — appeal — right of defendant to costs on appeal from judgment dismissing complaint but finding him guilty of fraud.**

A widow in a suit to have an assignment by her of her dower in certain property set aside on the ground that it was procured through the false and fraudulent representations of the defendants to the effect that said assignment was to be held as collateral security only, demanded the following relief: (1) An injunction *pendente lite* restraining payment to the assignee from her dower interest which had been admeasured; (2) a reassignment; (3) an accounting.

*Held,* on all the evidence that the assignment was absolute and so understood by the plaintiff at the time of its execution, and that it was not procured by false and fraudulent representations on the part of the defendants.

Where the trial court dismissed the complaint as to one defendant, but without costs, on the ground that he was not a proper party, but found him guilty of fraud, so that it was necessary for him to appeal in order to secure a review of the finding of fraud, said defendant is entitled to costs of the appeal as against the plaintiff.

APPEAL by the defendants, James H. Marsh and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 3d day of July, 1917, upon the decision of the court after a trial at the New York Special Term.

*James H. Marsh,* for appellant in person.

*Frederick N. Van Zandt* of counsel [*Edwin D. Webb* with him on the brief; *Greene, Hurd & Stowell,* attorneys], for the appellant Hosier.

*David Steckler,* for the respondent.

*Jay Noble Emley,* filing brief on his own behalf by permission of the court.

DOWLING, J.:

John P. Conlon died at the city of New York on April 5, 1899. He left a last will and testament dated March 21, 1877. Plaintiff, claiming to be the wife under common law of said Conlon, commenced an action on June 23, 1899, in the Supreme Court, New York county, to have her dower admeasured in three parcels of property belonging to said Conlon at the time of his death known as 39 Mott street, 321 West Sixteenth street and 121 Worth street, all in the city of New York. Because of the terms of Conlon's will, it was to the interest of his heirs at law that the existence of a widow should be proved. No evidence was offered at the trial to controvert plaintiff's claim that she was Conlon's widow. On September 5, 1900, a decree was made and entered in such action admeasuring her dower and determining that the gross and net annual rents for said properties were as follows: 39 Mott street, gross $2,702.50, net $1,507.40; 321 West Sixteenth street, gross $1,594.50, net $932.64; 121 Worth street, gross $3,600, net $2,074.40. The gross rent for the three parcels was $7,897; the net $4,514.44. The executor of the last will and testament of John P. Conlon was by said decree ordered to pay to the plaintiff one-third of the net annual income from said property, amounting to $1,504.81, in equal quarterly amounts of $376.20, starting with the quarter beginning May 17, 1900. Thereafter, by a decree made by the Supreme Court in the action of Winifred F. Jones and others against Mary Ann Kelly and others, brought for a construction of the will and to determine who were Conlon's legal heirs, it was among other things adjudged that Michael J. Dwyer, as executor and trustee of the last will and testament of John P. Conlon, deceased, had a power in trust to sell the real estate belonging to decedent and that the same should be sold by him, and after payment of the debts of the decedent and the costs of administration, and after making due allowance for the dower of the widow, the remainder should be distributed as therein provided. On motion of plaintiff, on August 21, 1902, by an order made in the action of *Conlon* v. *Kelly*, Thomas M. Mulry was appointed receiver of the three parcels of property of which decedent died seized for the purpose of carrying the judgment into effect and paying plaintiff her dower as directed. The receiver did

in fact pay over to plaintiff her quarterly installments of dower until June 19, 1907, when the premises No. 39 Mott street and No. 321 West Sixteenth street were sold under the power of sale contained in Conlon's will to Julius B. Fox who, in turn, on the same day, conveyed the same by a deed in which his wife joined, to Joseph L. Buttenwieser. Despite the sale, the receiver continued to collect the rents and claimed possession of the premises.

On January 24, 1908, Buttenwieser obtained an order to show cause why an order should not be made directing the receiver to account for and pay over to him the rents collected from No. 39 Mott street and No. 321 West Sixteenth street since June 19, 1907, and further directing the receiver to refrain from thereafter collecting any rent or interfering with the premises, and discharging the receiver. The petition of Buttenwieser recited that plaintiff had since the entry of judgment in *Conlon* v. *Kelly* assigned her dower interest to George B. Morris, her attorney. On March 2, 1908, an order was made granting Buttenwieser's application, directing the receiver to forthwith pay over to him the sum of $2,257.72, the excess of rents collected over disbursements since June 19, 1907, and ordering the receiver to deliver and surrender possession of the premises to Buttenwieser and to refrain from further collecting the rents thereof, or from otherwise interfering with the possession thereof, and discharging the receiver. Notice of appeal from this order was given by plaintiff on March 25, 1908, but the appeal was not argued in this court until January, 1910, when the order was affirmed (*Conlon* v. *Kelly*, 136 App. Div. 940), but upon appeal to the Court of Appeals the order was reversed and plaintiff's right to her continuing dower upheld on June 7, 1910 (199 N. Y. 43).

Meantime, within less than a month after her status as the widow of Conlon had been established by the decree of the Supreme Court, and on September 24, 1900, plaintiff brought an action (*Conlon* v. *Mission of the Immaculate Virgin*) to enforce an alleged agreement with her late husband, whereby in consideration of an agreement to perform certain services for him, and of certain moneys paid by her to him, he agreed that upon his death he would leave her all the property of which he might be seized and possessed. She claimed that,

the money she gave Conlon was $8,000 on a trip to Halifax and that she carried that amount on the trip in a bag around her neck. Upon the trial of the action judgment was given against plaintiff dismissing the complaint upon the merits December 18, 1902 (39 Misc. Rep. 215). On appeal to this court, the judgment was affirmed, with costs, but without prejudice to the right of the plaintiff to maintain any proper action she might be advised to bring to recover any indebtedness of the estate to her arising out of advances of money subject, of course, to whatever defenses might exist thereto (84 App. Div. 507). Thereafter, instead of following this suggestion, plaintiff moved for a new trial upon the ground of newly-discovered evidence, consisting of three papers alleged to be signed by Conlon and recently found by her among his effects. The motion was denied but upon appeal to this court the order was reversed and the motion granted, on payment of all costs to date (87 App. Div. 166). The action was then tried again on May 4, 1904, dismissing the complaint upon the merits, with costs, and in his opinion Mr. Justice O'GORMAN said: "The testimony offered in support of the claim is absolutely unworthy of belief. It is a mass of inconsistent, irreconcilable, improbable, contradictory and palpably false statements. I am convinced that the alleged agreement was never made and that the story of the alleged payment of $8,500 by the plaintiff is a pure fabrication. The decedent, when he met the plaintiff, was unmarried, about 50 years of age and possessed of considerable property, including several income-bearing parcels of real estate in this city. The plaintiff was living apart from a man whose name she bore and to whom it is said she was married. The relations of the plaintiff and the decedent were undoubtedly meretricious in their inception. The plaintiff claims that thereafter she became the common-law wife of the deceased. As she was so declared in a suit brought by her for the admeasurement of dower in his estate, I forbear expressing my own view from the evidence before me as to whether there ever was a change in their relations. But whether her supposed marriage with decedent occurred during the lifetime of her former husband or within a month after his death seems to be involved in much doubt. However, it is quite evident from her antecedents and the inferences which

First Department, January, 1920.        [Vol. 190.

they naturally suggest that she never had $8,500 or any other considerable sum at any time during her life before she succeeded in obtaining a decree giving her dower in this estate. A short time before she met the decedent she conducted a furnished-room house, which was closed out because of her failure to pay installments due on the purchase price of the furniture. She claims she gave the decedent the $8,500 while they were on a vacation trip to Halifax, and that she carried the money in a small bag around her neck. Why should she carry such an amount of money with her? The decedent had the necessary means to defray the expenses of the trip. Why should she give it to the deceased at Halifax rather than at New York, where they lived? What need had the deceased for the money at the time and where did he bank it or how did he use or dispose of it? The whole narrative is too preposterous to merit serious consideration. The genuineness of the three papers said to be written by the deceased is open to grave suspicion, but even if genuine in whole or in part, they were never delivered and by themselves are of slight consequence. The decedent was a hard drinker and it is possible that while intoxicated and under a designing influence he may have scribbled what appears on these scraps of paper. But they cannot affect my judgment that this is a base and unscrupulous attempt to subvert a last will and testament and to plunder an estate under guise of a pretended contract, which I am satisfied never had an existence." The judgment was affirmed by this court in May, 1905 (104 App. Div. 630), and by the Court of Appeals in December, 1906 (186 N. Y. 613).

In June, 1905, certain judgment creditors of plaintiff brought an action to have the transfer of her dower to her then attorney, George B. Morris, declared void. The summons was subscribed by more than one attorney and on motion the summons was set aside, unless plaintiffs all appeared by the same attorney. (*Jones* v. *Conlon*, 48 Misc. Rep. 172.) The administratrix of the estate of John P. Conlon also brought an action to set aside the transfer of plaintiff's dower right to Morris as in fraud of said administratrix's rights, and in anticipation of her obtaining a judgment for costs against plaintiff. A receiver having been appointed, the order was reversed by

this court in July, 1906. (*Dolan* v. *Conlon*, 114 App. Div. 570.)

On March 30, 1907, a deed of the premises No. 121 Worth street was recorded in the register's office of New York county, purporting to be a conveyance from John P. Conlon to Eva K. Conlon. On December 7, 1907, an action was commenced by Winifred F. Harding against plaintiff to have this deed declared a forgery, null and void, and to have it delivered up, canceled and destroyed, and the record thereof canceled. This action came to trial March 20, 1911, and on July 11, 1911, a judgment was entered declaring the deed a forgery and that it be canceled and destroyed. In his opinion Mr. Justice ERLANGER (referring to this plaintiff) said: "A history of this legal warfare in chronological order tends in no small degree to shed light upon the different efforts made by her to obtain possession of his estate in whole or in part, and shows her versatility in that particular. When results in the courts did not measure up to her conception of her rights, other means of attack upon the estate were introduced, and she is now before the court, not upon her own initiative, but because she is charged with an attempt of appropriating to herself a valuable piece of property through the means of a deed which plaintiff contends is a forged paper. * * *

" The conviction is forced upon me that Anderson was a pliant tool for some person who made forgery his business, and when the emergency called for his aid he readily took the acknowledgment to such deeds. But Anderson was otherwise discredited. While in prison on the Appleby charge he admitted to at least two persons that the deed which is the subject of this action was a ' crooked one.' True, Anderson before his death denied that he ever made such admission, but nothing in his record justifies the inference that the two witnesses referred to are to be discredited on account of such denial. I am not unmindful of the rule that ' courts of justice lend a very unwilling ear to statements of what dead men had said,' but it was never intended to apply such rule to a case like the one at bar. Anderson's evidence in respect to the execution of the deed, and its subsequent delivery to the widow by means of the advertisement, can aid her slightly in

First Department, January, 1920.          [Vol. 190.

this case. Does, then, the signature of deceased affixed to the deed, by comparison with the many standards offered on the widow's behalf, save her from the imputation that she is concerned in foisting upon the estate a forged instrument? Or is she aided by the witnesses who testified in her favor? I think both questions must be decided adversely to her.   *   *   *

" The widow was not called to testify in her behalf. She offered no explanation why she sought expert evidence shortly after the deed was delivered to her to determine its genuineness. It was left to her counsel to excuse her absence, and he undertook to do so by stating in his brief that the fact that Anderson got into trouble with the authorities was the motive for her act; but this is not justified by the proofs, because Anderson was not arrested until September 5, 1907, and his indictment occurred in October of the same year, while her experts reported the forgery to her in August of that year. The circumstances of the receipt of the deed through the advertisement was left to Mr. Campbell to explain. Her absence deprived the plaintiff of the opportunity of cross-examining her in respect of many details."

After February 8, 1908, the receiver had refused to make any payments of her dower to plaintiff, because of the pending litigation. This was because as to the Mott and Sixteenth street properties the Lawyers Title Insurance and Trust Company claimed that by the exercise of the power of sale the fee could be transferred free of the dower lien by payment of a lump sum, and it had taken a deposit from the purchaser to cover the same. The receiver, therefore, could get no moneys out of which to pay plaintiff's dower. He took the position that as to the Worth street property plaintiff's assertion of entire ownership therein was inconsistent with her dower right, which was merged therein, and, therefore, he would pay her no dower in that property. It was not until March 24, 1910, that the referee finally paid plaintiff her accumulated dower in the Worth street property amounting to $1,467.50, and on June 27, 1910, the Lawyers Title Insurance and Trust Company paid her $2,033.46 for the accumulated dower on the two other parcels of property.

While this litigation was progressing, a new suit was brought,

this time against plaintiff. On October 30, 1909, she was served with the summons and complaint in an action brought by Benjamin Steinman and Harry Meyers to foreclose a mortgage given to secure a bond for $6,500, wherein plaintiff was sought to be held liable up to the amount of $3,500. She demurred to the complaint on November 18, 1909, and thereafter negotiations for a settlement resulted in an agreement in writing on December 13, 1909, by which the action was to be discontinued and no further proceedings were to be taken against plaintiff until thirty days after the return of an execution unsatisfied to be issued on a deficiency judgment to be obtained against one Ford; in which event plaintiff waived any objection to action against her to enforce her liability. On October 5, 1910, a second action was begun by Steinman and Meyers upon her guaranty to pay any deficiency judgment not exceeding $3,500 obtained by the foreclosure of the mortgage referred to. On January 17, 1911, judgment was entered in their favor against this plaintiff in the sum of $3,627.45. This plaintiff appealed to this court, where the judgment was affirmed June, 1911 (*Steinman* v. *Conlon,* 145 App. Div. 919). Supplementary proceedings were brought involving four motions to punish for contempt of court, five appeals to the Appellate Division and one to the Court of Appeals. In the course of the proceedings plaintiff and defendant Hosier were both found guilty of contempt of court and each was fined $250. Emley was also found guilty of contempt, but allowed a week within which to purge himself of the contempt by producing plaintiff's transfers of dower (79 Misc. Rep. 527). On June 13, 1912, Steinman and Meyers commenced a judgment creditors' action against plaintiff and defendants Hosier and Marsh to set aside the plaintiff's transfer of her dower as fraudulent and made in pursuance of a conspiracy between the three parties named to place the dower interest beyond the reach of her creditors. During the progress of the proceedings, plaintiff went to Canada and remained there some time, after having been in hiding in New York. When the judgment creditors' action was about to come on for trial, on June 26, 1913, a motion was made for an injunction restraining the further collection of dower, which was granted. Thereafter and on September 20, 1913, the judgment was bought for the sum of

$3,000 by defendant Hosier, the assignment being taken in the name of Harold Kirke.

In the month of November, 1909, plaintiff's affairs were in the following condition: She was receiving no dower whatever, as the receiver had refused to pay her any further amounts under the judgment admeasuring her dower, (1) as to the Worth street property because of the pendency of the action to declare her deed to it a forgery and because she was claiming sole title to such property in conflict with her prior claim of dower therein; and (2) as to the Mott and Sixteenth street properties because of the pendency of the Buttenwieser motion to discharge the receiver and end her payments of dower therein, which had been decided adversely to plaintiff, but was then on appeal. The Steinman and Meyers suit had been begun, and she was facing a liability therein of $3,500. She had no real defense to this suit, and a judgment would result in her dower rights being reached and taken by her creditors. She was in pressing need of funds with which to pay the expenses of taking before a referee the testimony of the witness Anderson, then sick in a hospital, and vital to her in the Worth street litigation. At any time she could have abandoned the fight for the Worth street property and rested content with her dower rights. But she wanted the Worth street property as absolute owner. She had no return from her dower rights. She was in danger of losing everything to her creditors. In view of her previous record of litigation, she ran serious risks if her claim to the Worth street property was found to be fraudulent. Her attorney was urging her to secure the help of rich friends to raise funds to employ counsel to care for her interests in pending litigation. She had no moneys available and earned only eight dollars to ten dollars a week as a masseuse.

At this critical juncture, Marsh, her then attorney, who represented her in the Buttenwieser and Harding litigation and had been her attorney since 1907, according to her testimony, came to her and told her she would need from $300 to $600 to pay the printing bills on appeal to the Appellate Division, and a little more if it went to the Court of Appeals — perhaps a couple of hundred dollars; and that the referee's fees for taking Anderson's testimony would vary according to

the time occupied. The plaintiff claims she called on her friend Mrs. Belle Knapp and thereafter on Mrs. Hosier, whom she had known for three years. Thereafter about November 15, 1909, she saw the defendant Hosier. Her version of what took place is: " I went in and seen Mr. Hosier and I said: ' Mr. Hosier, I have come down to see if you can or will let me have a few hundred dollars. My income has not been coming in, as you know, for about two years. The Sixteenth Street and Mott Street property has been sold and the buyer has brought a motion in the Supreme Court to rid the property of my dower and for the receiver to be discharged, therefore there is no one to get me my dower. Judge Platzek has decided a motion, it has gone against me, and I will have to get papers ready for an appeal, and my attorney has told me that I will need some money to pay the printing.' I said, ' I also, Mr. Hosier, have engaged — Mrs. Coe.' Mr. Hosier knew who Mrs. Coe was. ' She has got me a counsel that will carry the case, will appeal the case for me. I then would like '— he asked me how much. I said my attorney told me somewhere between three and four hundred dollars, it was according to how far it would go; if it only went to the Appellate Division I would not need so much, and I did not care to go to strangers; I preferred to deal with people that I knew. I told him I had been to Mrs. Belle Knapp and Mrs. Belle Knapp told me that she was not in a position to let me have any more, as she had already lent me a thousand dollars and I had given my jewelry for security. Mr. Hosier said, ' Why, yes, Mrs. Conlon, I am sure, for the sake of the friendship in the family, as much as they have all thought of you, I certainly would be glad to help you.' He asked how much I would need. I told him I did not know, but I would bring my attorney in and he would explain the matter more fully, that they wished to have me take a lump sum, but I did not care to do that, as that was my life interest to live on, and I wished to retain it."

By " they " she said she referred to Buttenwieser and Conlon's heirs. Hosier, she says, told her that he would let her have the money she needed, and he would be only too glad to help her, because of the family friendship. The amount of the advances was not specified. That evening she

saw her attorney Marsh and told him: " That I had succeeded in getting the loan of the money. He asked me from who. I said it was Mr. Hosier, the son-in-law of Mrs. Knapp, and he was very glad that I had got it, and I told him the conversation I had with Mr. Hosier, and I said: ' I told Mr. Hosier I would bring you in so you could explain matters more clearly and fully to him.' "

A couple of days afterwards, she claims to have brought Marsh with her to see Hosier, whereupon Marsh is testified by her to have said: " Mr. Hosier, the decree was rendered Mrs. Conlon in September, 1909, awarding her an income of $1,500 a year, and as the property has been sold there is no one to pay her dower. Now we are obliged to take an appeal and she will need some few hundred dollars to do so, and she has told me that you are willing to let her have it. She wishes to give you her dower as security and she is willing to pay you six per cent interest.' Mr. Hosier said, ' Yes, Mrs. Conlon has been here and I am perfectly willing.' Mr. Marsh says, ' No matter how it would go, Mr. Hosier, even if this was sustained,' he says, ' she would get a good round lump sum; you are not running any risk, as she has not been getting her income for over two years; there will be about two thousand dollars coming to her.' He says, ' I advise her, too, that she should keep her life interest; ' and he said, ' If she was to take it under the Northampton table '— Mr. Hosier said, ' What does that mean? ' Mr. Marsh says, ' Well, a widow has the right '-- By the Court: Q. He explained it? A. Yes, he explained it to him. By Mr. Steckler: Q. Did he tell him how much in amount the dower was worth under those tables? A. He said it was according to the age; as I grew older I would not get as much; if I had taken that outright at first, why, then I would have got more, and he says, ' Mrs. Conlon prefers to keep that; that is what she has to live on for life.' Q. When he said if this was sustained, what did he mean by that? A. Why, he meant if the motion in the Appellate Division — that if they sustained Judge Platzek upon appeal. Q. You mean in his decision that the receiver should be discharged? A. Yes. * * * Mr. Hosier said he had a great deal of respect for Mrs. Conlon and her ability to go to work, and he said, ' I will be only too glad to help her; anything I can do

for her I will be only too glad to do so.' * * * And he asked when I would want the money, and I said to him, ' Well, Mr. Hosier, Mr. Marsh tells me that a man is sick in a hospital and there has got to be a referee appointed or there is one appointed to take testimony in regard to the Worth Street house. I had a suit there, but I don't know whether that will materialize or not, but that probably may be the first money I will need, and I will have to see — we will see about that afterwards.' He asked me if I wanted any then, and I told him no. Q. Was there anything said about amount? A. Amount? Q. Yes. A. Only from five to six hundred dollars, according to what that testimony would be, if it was two or three hundred dollars, and then just separately for the printing bills. Q. Did Mr. Hosier say anything about the amount? A. He asked Mr. Marsh how much it would be, and Mr. Marsh said it would not be over five or six hundred dollars, it could not be. Mr. Hosier said, ' Well, I will lend Mrs. Conlon the amount up to a thousand dollars.' Q. Was anything said about papers? A. Mr. Marsh said to Mr. Hosier, ' Have you got an attorney? ' And Mr. Hosier said, ' Oh, no, I know Mrs. Conlon very well.' And he said, 'Anything she wishes to do I will depend on, and if she asks you — she can make up whatever she says; whatever she wants I will agree to.' I made it plain to Mr. Hosier that I did not wish him to lend me the money without six per cent interest, and in case of my death he would have no trouble." After they left Hosier she says she said to Marsh, " Now, Mr. Marsh, you prepare the papers which I will give Mr. Hosier as security for the dower — as security for the money he loans me ; " that Marsh within a week brought two papers up to her residence, all prepared; that they were " just a foolscap sheet of paper, just a plain sheet of paper, with printing on it * * * and some typewriting; " that the paper was signed by her that day on two single sheets, one a duplicate of the other; that Marsh took them away after she had signed them, and a couple of days afterwards they met and went down together to Hosier's office at 67 Front Street, where " Mr. Marsh took the envelope out of his pocket, handed them to me. ' Mr. Hosier, I have brought the papers that you asked Mrs. Conlon to prepare so she can get the loan of this money.'

And he handed them to me and I handed them to Mr. Hosier. Mr. Hosier said, ' Very well, I will put them in the safe,' and he told me that he was a very reliable man, that he was the president of some company, and he certainly would keep my money straight. He asked me if I needed any money then. I told him no, when I did I would come to get it; I would need just as little — I would take as little as I possibly could. Mr. Marsh explained to him that there was over $400 owing to me, if I got that I would need very little; it was promised me."

These papers delivered to Mr. Hosier, according to plaintiff, consisted of one of the duplicate original assignments and of one affidavit of title, claimed to have been signed the morning after the assignments were executed. The duplicate original assignment was kept by Marsh, she testifies. She claims that the assignments were signed by her in her apartment in the presence of one Banker. She says no notary was present when she signed the affidavit, but she admits she signed it and that the signature thereto was hers. This affidavit is as follows:

" STATE OF NEW YORK, ⎱ ss:
COUNTY OF NEW YORK. ⎰

" Eva K. Conlon being duly sworn says that she is the widow of John P. Conlon, deceased, and that as such widow she is entitled to dower in the Estate of which the said John P. Conlon died seized. That by a decree of the Supreme Court, State of New York, dated September 5, 1900, she was awarded one-third of the net income from said estate as and for her dower therein amounting to $1507.40/100 per year. That since February, 1908, she has not been paid any money for her dower in said estate and that the same has been accumulating since such date.          "EVA K. CONLON.

" Sworn to before me this
22nd day of November, 1909.
          " JOHN B. FASOLA,
               " Comm. of Deeds,
                    " N. Y. City."

She swears that no notary or commissioner of deeds was present when the assignments were signed by her. The papers,

she says, were signed on November 22, 1909, and she delivered to Hosier on November 24, 1909, one of the duplicate original assignments and the affidavit, though the papers were supposed to be in an envelope handed to her by Marsh and by her given to Hosier without opening the envelope. She swears the assignment she gave Hosier was a transfer from her to him of her dower as security or collateral for a loan.

The papers she signed were in fact two. One was signed by plaintiff dated November 22, 1909, signed in the presence of F. E. Edwards and acknowledged before John B. Fasola, commissioner of deeds, New York city, whereby for a consideration of one dollar and the grant and conveyance of certain property theretofore caused to be conveyed to plaintiff by James H. Marsh, situate in the city of Buffalo and town of Tonawanda, plaintiff granted, conveyed, transferred and set over unto James H. Marsh all her dower, right of dower, property, possession, claim and demand awarded to her by the decree of the Supreme Court, dated September 5, 1900, and all money due and to grow due thereon or therefrom. The recitals in the assignment described each parcel by metes and bounds, recited the terms of the judgment admeasuring the dower as to the gross and net rentals of each parcel of property and further recited that " being so entitled to dower in the aforesaid property said party of the first part [plaintiff] agreed with said party of the second part [Marsh] to exchange said dower and right of dower for certain property in the City of Buffalo and Town of Tonawanda." Plaintiff denies that she ever knew F. E. Edwards, admits that she knew John B. Fasola, but he was not present when it was signed and she never acknowledged the paper before him. She says she never received a transfer of any property in Buffalo or Tonawanda from Marsh, but admits she did receive deeds to property in Buffalo and Tonawanda from Viola Lowrie and Charles Buchbaum. The record from the clerk of the county of Erie shows a conveyance of lands in Buffalo and Tonawanda from Charles Buchbaum to plaintiff dated July 1, 1908, recorded August 5, 1908, and of lands in Buffalo from Viola Lowrie to plaintiff dated July 18, 1908, recorded August 13, 1908. Plaintiff made conveyances of parts of these lands in 1909 and 1910, five deeds from her appearing on record. Plaintiff

claims that she got title to these lands because she advanced money to Cohen that he was to pay on an exchange of property for the Buffalo property; that Buchbaum was Cohen's brother-in-law and Cohen was in the real estate business, having an office with defendant Marsh; that she gave defendant Marsh $1,750 in June, 1908, some of which she had saved up from the time she was in business and the balance of $1,000 she raised by pawning her jewelry. She says that she signed several papers in blank, as he might not be able to get her when he wanted to make contracts to exchange the Buffalo lots. She claims she got the Buffalo property under an arrangement with defendant Marsh that if she put up $1,750 she would get that property. She did not have the deeds to this property at the time of the trial and she thought Marsh had them.

She claims not to have discovered that the transfer of dower to Marsh was recorded until 1913, when she learned it from Mr. Emley, as follows: " Mr. Emley told me that he wanted to see me in regard to drawing up a paper in regard to the Worth Street property, my dower in the Worth Street property. He said he was afraid Mr. Goebel was going to bring a suit for costs that had been awarded him in Harding against Conlon, and he wanted me to get out of the city because he didn't want any more trouble with Mr. Hosier, he was a fool, and he didn't know what he knew or what he didn't know, and that he wanted me, in case this come up — that he could never go through with Mr. Hosier again in this matter, if Mr. Goebel was to bring a suit in regard to my dower, and there was a whole lot more talk about it. I said, ' What's the matter? ' He said, ' You know Mr. Hosier put your papers on file,' and he said, ' They had them up in supplementary proceedings, Steinman, and I had a great deal of trouble,' and he said, ' Now I wish you to sign a paper, so in case they bring this suit that it will be all right, or if you should die there would be no trouble.' I said, ' I don't know what you mean, Mr. Emley.' So then I went out to Mundy and I said, ' What is the meaning of all this business, Mr. Mundy? You send me away to Canada. Now,' I said, ' Mr. Emley wants me to sign some papers.' He said, ' Mrs. Conlon, don't you sign a paper more, they intend to deprive you of every dollar you have got, and I am going to leave this office on that

account.' He said, ' Meet me downstairs and I will tell you.' I went downstairs in William Street, around the corner and met Mr. Mundy."

But plaintiff admits that the signature affixed to the assignment of her dower to Marsh is her signature. On cross-examination she said she signed that very paper on November 22, 1909, in her apartment, around noon, and that Banker was present during the transaction; Marsh left half an hour to an hour afterwards. She claims she signed two single sheets of paper, and that the three pages now physically attached to the page containing her signature were not attached when she signed. She understood the two papers she signed to be identical duplicates, " one original and one copy." In answer to questions by the court she said she knew the signature attached to the assignment was hers, but she could not remember the occasion when she signed it.

By the court: " Q. Then how can you say that there were not the three sheets preceding the fourth sheet when you signed it? A. They was not in the two papers I signed. I say that is my signature on that paper. Q. What you mean is this, then, I take it, or at least that is what I understand, that this is not the paper which you signed when you signed the two papers assigning your dower to Mr. Hosier? A. That is right. Q. That this must be some other paper? A. This is another paper. Q. So when you say that the first three sheets of this Exhibit 8 were not attached to the fourth sheet when you signed the fourth sheet, you really do not know whether they were or not, because you don't know when you signed this Exhibit 8? A. No, I don't know."

She was then further cross-examined: " Q. Now, madam, I call your attention to the fact that Plaintiff's Exhibit 8 purports to be an assignment by you to one James H. Marsh of your dower right in three distinct pieces of property. Did you ever execute any instrument assigning your dower right in these three pieces of property to one James H. Marsh? A. No. Q. At no time? A. At no time. Q. And as you sit there now on the stand under oath, you assert that you never knowingly signed any instrument assigning your dower right to such a person as James H. Marsh? A. I do. Q. Whether it be the father of the defendant in this action or the defend-

ant himself, is that right? A. That is right. Q. (Handing paper.) Now I show you Plaintiff's Exhibit 9, which purports to be an assignment by James H. Marsh to Edward B. Hosier, dated the 22nd of November, 1909, and I ask you whether you ever saw that paper, or whether at your direction it was executed, or any paper like it executed. The Court: Look at the paper carefully first. Now let the question be read. Q. (Question repeated.) A. I don't remember anything at all about this paper. Q. That is not an answer to my question, madam. I ask you this, listen, did you ever see the paper marked Plaintiff's Exhibit 9 until it was shown to you at the last trial of this action? A. That is the first time I saw it. Q. Did you ever at any time direct one James H. Marsh, whether it be the defendant in this action or his father, to execute an assignment to Mr. Hosier, the defendant in this action? A. No. Q. There is no doubt about that, is there? A. None whatever."

Exhibit 9, referred to in the question above set forth, is an assignment from James H. Marsh to Edward B. Hosier, in consideration of one dollar and other good and valuable considerations, of " all dower, right of dower, property, possession, estate, claim and demand, which was conveyed to the party hereto of the first part, by deed of conveyance made by Eva K. Conlon, the party thereto of the first part, dated the 22nd day of November, 1909, and all right, title and interest in and to the property described in said conveyance, and all the rents, profits and sums of money due or to grow due thereon." It bears date November 22, 1909, and purports to have been acknowledged before John B. Fasola, commissioner of deeds, New York city, on the same date. Both these assignments were recorded in the register's office, New York county, November 24, 1911.

The plaintiff upon the trial produced a paper which she had also produced upon the former trial. This she said was " like the one I signed;" " the size and type was the same as I signed;" she finally said it was like the one she signed because it was on a single sheet. This paper she says she found among Marsh's effects in her home. It is obviously a carbon copy of the typewritten matter on the first page of the assignment from Marsh to Hosier. When she discovered this paper does not

appear, but it then gave her notice that she had transferred all her dower to Marsh, who in turn had transferred it to Hosier.

After November 22, 1909, Hosier made advances on plaintiff's account for her litigation, beginning with payments on December 7, 1909, of $225 for the referee's fees for taking the testimony of the witness Anderson in *Harding* v. *Conlon* and $121.45 for stenographer fees in the same matter. Hosier gave no immediate notice to the receiver of the assignment to him, and so when the receiver finally made a payment on March 24, 1910, on account of the deferred dower (amounting to $1,467.50), it was made directly to plaintiff by the receiver's check to her order. This he paid after the decision of the Appellate Division in *Conlon* v. *Kelly* (137 App. Div. 277) that her claim to own the Worth street property did not affect her dower. Plaintiff turned this check over to her friend Mrs. Coe who disbursed it under plaintiff's orders, and plaintiff gave only $400 of the amount to Hosier. Hosier made some other advances for plaintiff as required, and finally on June 27, 1910, the Lawyers Title Insurance and Trust Company after the reversal by the Court of Appeals of the order in the Buttenwieser motion, paid $2,033.46 for the accumulated installments of dower and a check for $590.63 costs. These plaintiff turned over to Hosier, and on the same day she received a paper from him. This she claims was a statement of account by Hosier to her showing a balance to her credit of $854.14. The paper is headed:

" STATEMENT
" To RAFFERTY & HOSIER, Dr.,
" Wholesale Grocers
" 67 & 69 Front Street.
" E. K. CONLON          NEW YORK, *June* 27, 1910."

Then follow the debit and credit items.

" I asked him for it [the statement], went down to his office. * * * Q. That was the same time you got the $750 check for Mr. Swift, and other checks you have just mentioned? A. Yes, I went down and got my $300 in his office. * * * Mr. Hosier gave me this and said, ' Mrs. Conlon, you have to your credit $845 and some cents.' He said, ' I am very glad that this motion has been decided in your

favor, because I would not be able to let you have — to lend you any more money. I am in a little financial difficulties myself, the business is not paying, and I have been thinking very seriously for months of going out of business; one of my clerks has collected $500 and got away with it,' and he said, ' My wife has been sending in bills, she has been running bills very strongly,' and he said his wife's creditors were sending these bills down to his office, and it was annoying him very much, and he said to me, ' Would you leave that here and I would keep very careful account of it, just leave that amount here, so I can leave it in my bank.' Q. What did you say? A. ' Yes, Mr. Hosier, I will be only too glad to return the favor; you were very kind to me, and you are quite welcome, and I will have my Worth Street checks come directly to you; the others I will have sent to Mr. Conklin, of the 16th and Worth [Mott] Streets, and if there. is enough there to pay any costs which I will have, I won't have to come to you, and this will remain here."

This is the basis of plaintiff's contention that on June 27, 1910, she had paid back all advances made for her by Hosier, had a balance to her credit and that thereafter he acted as a sort of banker for her. Later (in 1912) she received another statement from Hosier, which bears no heading of his firm, contains no credit items, and shows disbursements made for her amounting to $4,364.63. It purports to show payments made by him for plaintiff's benefit from February 17, 1910, to September 7, 1911. Thereafter, he made other payments from October 19, 1911, to November 17, 1913, all in connection with expenses of litigation in which plaintiff was involved, save two payments of $20 to plaintiff personally; these payments were exclusive of the purchase by him of the Steinman and Meyers judgment against plaintiff for which he paid $3,000 in cash.

Plaintiff brought this action and in her complaint alleged that prior to November 22, 1909, she was a party to litigation to establish her right to dower in No. 39 Mott street and property on West Sixteenth street, and also her title to No. 121 Worth street; that defendant James H. Marsh was her attorney in such litigation; that she was in need of funds to pay referee's fees and to protect her interests in the litigation

and that defendant Hosier agreed to advance to her whatever moneys might be necessary to carry on the litigations in which plaintiff was interested. It is then alleged:

"*Fifth.* That on or about the 22d day of November, 1909, James H. Marsh, one of the defendants herein, who was attorney for plaintiff herein in the aforementioned litigation, visited plaintiff at her residence No. 602 West 135th Street, and then and there had plaintiff sign instruments in writing which said James H. Marsh advised plaintiff herein were for security and collateral for the loans which said Edward B. Hosier was to make to plaintiff herein to defray the referee's fees and legal expenses in the aforementioned litigation.

"*Sixth.* That thereafter, and on or about the 23d day of November, 1909, plaintiff herein delivered to said Edward B. Hosier, one of the defendants herein, at his office No. 69 Front Street, in the Borough of Manhattan, City of New York, the said instruments signed by plaintiff on said 22d day of November, 1909.

"*Seventh.* That said defendant James H. Marsh stated and represented to plaintiff on said 22d day of November, 1909, that the said instruments so signed by her were to be merely security and collateral for any moneys advanced by said Edward B. Hosier to plaintiff herein, and said Hosier agreed to so hold the same.

"*Eighth.* That the plaintiff herein relied upon said representations, and was thereby induced to sign said instruments.

"*Ninth.* That said representations were false and were known by said James H. Marsh and said Edward B. Hosier to be false and were made with the intent to defraud and deceive this plaintiff, in that said instruments signed by plaintiff as aforesaid, were assignments of her dower right in and to premises known as No. 39 Mott Street, and the premises on the north side of 16th Street between Eighth and Ninth Avenues, and No. 121 Worth Street, in the Borough of Manhattan, City of New York."

It is then set forth that thereafter Hosier advanced to plaintiff certain moneys necessary to carry on her litigation; that her right to dower was judicially re-established; that Hosier received between March 31 and June 27, 1910, the sum of $3,196.94, dower which had accumulated; that on June

27, 1910, he had reimbursed and repaid himself from moneys collected for all advances made, and that plaintiff thereupon became entitled to a return of her dower, in accordance with her understanding and agreement with Marsh and Hosier. It is further alleged that said dower has not been returned and that Hosier has retained and continues to collect the same. It is then set forth:

" *Fourteenth.* That on or about the 23d day of November, 1909, said Edward B. Hosier represented to plaintiff herein that the instruments delivered to him by plaintiff were merely security and collateral to protect said Hosier in case of plaintiff's death; and that said Edward B. Hosier told plaintiff herein that said instruments would be placed in his safe and would never be placed on record. That plaintiff herein relied upon such representations made by said Edward B. Hosier, on said 23d day of November, 1909, and was thereby induced to deliver to said Hosier the instruments signed by plaintiff on said 22d day of November, 1909.

" *Fifteenth.* That said representations were false and were known to defendant Edward B. Hosier, when made, to be false, and were made with the intent to deceive and defraud this plaintiff, in that said Edward B. Hosier knew that said instruments were absolute assignments of plaintiff's dower interest.

" *Sixteenth.* Upon information and belief, the instruments so assigned by plaintiff to said Edward B. Hosier, were recorded in the office of the Clerk of the County of New York on the 24th day of November, 1911, without plaintiff's knowledge or consent."

By reason of the premises, plaintiff is alleged to have been cheated and defrauded out of large sums of money, Hosier having received $800 annually since June, 1910, and disposing of the same to various attorneys for alleged professional services and otherwise.

The relief demanded is (1) an injunction *pendente lite* restraining the Lawyers Title Insurance and Trust Company from paying further sums to Hosier and restraining Hosier from receiving same; (2) that Hosier be directed to make a reassignment of the dower rights to plaintiff; (3) that an accounting be had by Hosier and that he pay over any balance found due to plaintiff, she being ready and willing and offering

to pay Hosier any amount due him on said accounting. The answer of the defendant Hosier denied the making of the alleged representations and that the assignment of dower was given as security and denied practically all the allegations of the complaint, except the conveyance of the dower rights to him. He further set up as a separate defense the following:

" *Sixteenth.* Alleges that in or about the month of November, 1909, the plaintiff, Eva K. Conlon, was a party to litigations which were to be carried on to establish the plaintiff's dower right in premises known as No. 139 [*sic*] Mott Street and premises on the north side of West 16th Street between Eighth and Ninth Avenues, in the Borough of Manhattan, City of New York, and also a certain litigation, the purpose of which was to establish plaintiff's title in fee to the premises known as No. 121 Worth Street, in the Borough of Manhattan, City of New York.

" *Seventeenth.* That plaintiff represented to the defendant Edward B. Hosier that she was out of funds to carry on said litigations and that she was particularly desirous of establishing her ownership in fee to the premises No. 121 Worth Street, and requested defendant to advance the necessary funds to carry on said litigations; that thereupon the defendant Hosier agreed to advance the funds necessary for that purpose from time to time without any promise on the part of the plaintiff to repay same, and in consideration of such advances so to be made the plaintiff agreed to and did convey her dower right of said premises to the defendant Hosier absolutely, and that said defendant is now the owner of said dower rights absolutely in his own right and has since said conveyance paid all sums necessary to carry on said litigations, and that the litigation to establish plaintiff's ownership in fee of the premises No. 121 Worth Street, in the Borough of Manhattan, City of New York, is not ended but is still pending, and that defendant is still paying sums necessary to carry on such litigation, and in connection with said litigation of plaintiff is necessarily expending sums of money in excess of the amounts received by him from plaintiff's dower interest so conveyed to him."

The defendant Marsh denies most of the allegations of the complaint, including all charges of misrepresentation, and denies any agreement for the return to plaintiff of her dower. He

asserted no claim to the dower in his own right or that of his father, who bore the same name.

The plaintiff's case, in so far as the original transaction with Hosier and Marsh is concerned, rests upon her own testimony, with such support as is to be found in alleged contradictory statements as to the nature of the title made at various times by defendants Hosier and Marsh, sometimes under oath; deductions drawn from some of the documentary evidence; the testimony of Banker claimed to have been present at the time of plaintiff's execution of the assignment; the testimony of Mundy and McInerny as to admissions made in and about Emley's office by various of the persons involved as to the ownership of the dower, the nature of Hosier's title thereto, and the general fraudulent practices claimed to have been pursued to defeat the collection of the Steinman and Meyers judgment; the testimony of Mrs. Knapp, Little and Purdy as to the check for $560, claimed to have been given by plaintiff to Mrs. Knapp to repay half of the loan (with interest) claimed to have been made by Mrs. Knapp to plaintiff to enable her to get her jewelry out of pawn, which plaintiff asserted she pawned to raise $1,000 of the amount she put into the Buffalo deal, and the testimony of Newmark, an attorney, in reference to certain details of the affairs of Mr. Mulry, as receiver, including a demand made by Marsh January 2, 1912, a notification from plaintiff on November 24, 1911, that she had assigned her dower to Hosier and had no further interest therein and a letter dated November 22, 1911, from Emley that Hosier demanded payment of the past due dower.

In rebuttal plaintiff also offered the following testimony: William Fieselman called to testify as to Fasola's leaving the building where he had his office and Marsh's ignorance of his whereabouts; Leviness, a man seventy-seven years old, as to Marsh's calling with plaintiff in November, 1909, at Hosier's office; William R. Conklin, an attorney, as to an affidavit by Marsh; Marsh, as to this affidavit; Ralph H. Cohen, as to the details of the various trades culminating in the Buffalo real estate transaction, and that he never knew or heard of Marsh's father in the transaction, and that defendant Marsh was the real person interested therein, wherein Lowrie and Buchbaum were " dummies " for Radford and Cohen respectively, and

further, that the transfer from Buchbaum to plaintiff of the lots was at defendant Marsh's request; and finally, Edward Harding, as to payments of dowers made by the Lawyers Title Insurance and Trust Company. The exhibits for both sides are voluminous.

Plaintiff's version of what took place at the first interview with Hosier is contradicted and is uncorroborated. Concededly, plaintiff is unworthy of belief. Her counsel, on the argument as in their brief, does not ask that she be believed on any point on which she is without corroboration. This condition is due to her own record of attempts to accomplish what the courts have heretofore held were frauds upon Conlon's estate, sought to be sustained by perjury and forgery. Nor does the record in this case show that her past experiences have made her any more solicitous about telling the truth under oath. The learned court at Special Term in his second opinion said: " And it may be pertinent to add that on this feature of the case, as upon every other, I have refused to accept Mrs. Conlon's uncorroborated testimony upon any controverted fact. She has shown herself to be neither a careful nor a scrupulous witness." Upon this trial the only corroboration of her story as to what occurred when the assignment was signed by her was that of the witness Banker, who was conclusively demonstrated to be absolutely unworthy of belief.

As against plaintiff's belated attempt to assert that her assignment of her dower to Hosier was as security only, and not absolute, we have repeated declarations of hers to the contrary. It is to be remembered that she now claims that she signed two papers, of one sheet each, an original and a duplicate (or copy), which she says (and produced the discredited witness Banker to corroborate her) were an assignment direct to Hosier as security or collateral for moneys to be advanced by him to carry on her litigation. She claims that she knew nothing of any transfer to Marsh by her, or by Marsh to Hosier; that Hosier agreed that he would put the papers she gave him in his safe and never record them, and that they were recorded on November 24, 1911, without her knowledge. She admits the signature to the assignment to Marsh is in her handwriting, but explains it by saying she signed papers from him in blank having to do with the Buffalo property; but repudiates

the idea that she knew anything about a transfer to Marsh, though she had in her possession a carbon copy of the type-written matter in the assignment from Marsh to Hosier, reciting her very transfer to Marsh. The most convincing refutation of her story can be found in her own statements in writing: (1) Her letter to the Lawyers Title Insurance and Trust Company, dated November 24, 1911, in which she says:

" GENTLEMEN.— I beg to inform you that on the 22d day of November, 1909, I assigned my dower interest in the premises known as Mott and 16th Street to James H. Marsh, and I am informed that Mr. Marsh thereafter assigned the same to Edward B. Hosier of No. 397 Greenwich Street to whom all payments thereon have since been made. I have no interest in said dower and the same as it accrues should be paid to Mr. Hosier or his assigns.          Yours very truly,

" EVA K. CONLON."

(2) Her letter to Thomas M. Mulry, receiver, also bearing date November 24, 1911, as follows:

" DEAR SIR.— I beg to inform you that on the 22d day of November, 1909, I assigned my dower interest in the premises known as No. 121 Worth Street, Borough of Manhattan, New York City, to James H. Marsh, and I am informed that Mr. Marsh has since assigned the same to Edward B. Hosier of No. 397 Greenwich Street, to whom all payments thereon have since been made. I have no interest in said dower and the same as it accrues shall be paid to Mr. Hosier or his assigns.

" Very truly,

" EVA K. CONLON."

(3) Her affidavit dated July 26, 1911, in the action of *Harding* v. *Conlon,* on the application to procure a stay of execution of the judgment pending an appeal to this court, wherein she swears: " That deponent is without means and is unable to furnish a bond to secure the payment of the costs which were awarded against deponent in this action, and that unless a stay is obtained an appeal will be rendered of no avail by reason of the fact that defendant's evidence of title will be destroyed under the judgment and order of this Court, if put into effect before the hearing and determination of the said appeal."

(4) Her affidavit, verified January 6, 1912, in opposition to the application for the appointment of a receiver in *Steinman and Meyers* v. *Conlon,* in which she swears: " That long prior to the entry of this judgment, to wit, on November 22, 1909, deponent duly assigned all her interest in the money which it is sought to reach by these proceedings and assigned her dower interest in the property known as No. 121 Worth Street, this city, and all moneys due or to grow due thereon to one Edward B. Hosier, who as deponent is informed and believes, is now the owner of said property, right and claim thereon and is entitled to demand and receive any and all moneys due now in the hands of Thomas M. Mulry, whose examination as a third party is attached to the moving papers and said Edward B. Hosier is entitled to demand, receive and collect any and all sums which may hereafter become due by reason of deponent's dower interest or any interest which she may have in said Worth Street property under and by virtue of the judgment of the Supreme Court, entered September 11, 1900."

She also swears therein that " said assignments have been duly recorded as deponent is informed and believes in the office of the Register of the County of New York " and that " for more than a year past the said Thomas M. Mulry has made all payments on account of the said dower interest of deponent in said property direct to Edward B. Hosier and that said Thomas M. Mulry has known for a long time of said Hosier's interest in the said dower and that deponent's rights thereto had been transferred to said Hosier." She attaches a copy of her notice to Mulry.

(5) Her answer, verified July 25, 1912, in the action of *Steinman and Meyers* v. *Conlon* wherein she averred " that she has duly assigned for a valuable consideration all her right of dower in certain premises in the city of New York to the defendant Edward B. Hosier," and also avers " that the assignments of dower to the defendant Hosier were duly executed on November 22, 1909, and were duly recorded on the 24th day of November, 1911." She denied any fraudulent purpose in making the assignments.

(6) With full knowledge of all the facts she signed the following letter and demand, prepared by her attorney when this suit was about to be brought. Mr. Towns did in fact

commence this action on her behalf, and she swears that the people in his office were always very careful to have her read anything that she signed; and that in fact every paper that was given to her to sign by Mr. Towns or by those in his office she either read or it was read to her before she signed it. This is her demand, preliminary to the bringing of this suit:

" Law Offices of
" Mirabeau L. Towns
" Woolworth Building
" 233 Broadway, New York
" Telephone 7184 Barclay     Cable Address ' Mira Town '
" *January 14th*, 1914.
" Edward B. Hosier, Esq.,
     " %o Clark, Chapin and Bushnell,
       " 397 Greenwich Street,
         " New York City:

" Dear Sir.— I hereby demand of you the immediate return to me of a certain assignment, dated November 22, 1909, of my dower interest in the real estate left by John P. Conlon, deceased, located in the City of New York.

" This assignment was made by me to one James Marsh and at my direction assigned by said Marsh to you as security for a loan advanced by you to me, and to cover any advances that you might make to me from time to time, at my request.

" I understand that you placed this assignment on record some two years afterwards. In case you have placed this paper on record, I demand that you deliver to me a satisfaction and cancellation of the same, duly acknowledged and executed.

" Should any proper and legal disbursements made at my request and in my behalf exceed the amounts you have received from time to time of the dower coming to me, since the time of said assignment, I hereby inform you that I am ready and willing to pay and discharge the same on delivery to me of such assignment of dower, or the cancellation and satisfaction of the same should it have been placed on record.

           " Yours respectfully,
             " EVA K. CONLON."

The defendant Hosier testified as to what occurred on plaintiff's first visit to him at his office. She had previously, for

upwards of two years, been a masseuse for Hosier's wife and mother-in-law. When she visited him, upwards of a week before the papers were signed, she said: " ' I suppose you are surprised to see me.' I said, ' Yes; what can I do for you?' ' Well,' she said, ' you know '— she said, ' You know they have stopped my dower, and they are contesting my right to the piece of property in Worth Street.' She said, ' I have a deed for that property and it is in litigation, and the expenses in connection with that are considerable,' and she said, ' They have stopped my dower, and they think by that that they will be able to get that Worth Street property away from me. My lawyers say that I will have to get funds immediately.' And she said, ' Now, your wife has always been very kind to me, your family, and I have jokingly said that I was going to make her my heiress or heir,' whatever she used, ' and I want her to have this now. She might as well have it now. But I have got to have money to conduct this litigation, the expenses of this — the expenses incurred in this litigation.' By the Court: Q. That your wife might as well have her dower interest now; is that what you mean? A. I am saying what she said. Q. But that was what she said to you? A. Yes; she said that she might as well have it now; that the all important thing to her was this Worth Street property which was very valuable matter, and if she got that, that was more than enough to meet any of her moderate requirements, but I would have to pay the expenses of the disbursements, and so forth, incurred in this Worth Street litigation; and as regards the dower that had been stopped, of course I would have to attend to the payment of the expenses in that. * * * The Court: * * * The witness means expenses incidental to proceeding to overcome the objection to its payment. Is that correct? The witness: Correct. Q. That is what you understood? A. Correct. * * * She said that she would assign the dower to me and that there might be some heavy drafts immediately, but the lawyers had told her a number of bills would be forthcoming very promptly, but subsequent to that, * * * they would be very, very light, and that she would assign the dower to me if I would agree to take care of those obligations." By " those obligations " were meant " the out-of-pocket expenses or disbursements, not including counsel fees,

that should be incurred by her in the future with respect to this litigation concerning her title and the forged deed, as we now know it, and the overcoming of the obstruction to the payment of the dower." No estimate was given as to what the disbursements would amount to.

" Q. What did you say to her in response to this request of hers? A. I told her I was not in the habit of doing things of the kind; I would give it some consideration. Asked her when she wanted to know. She said she would have to know very promptly. Q. You said something about consideration, that you would give it some consideration? A. I would give it some consideration. She said that she had — she had come to me as a last resort, that she had been endeavoring to raise funds unsuccessfully and it had got to a point where she would have to know right away."

A couple of days later she returned, again alone. " Q. What took place on the second visit? A. She said that she hoped that I was going to take the dower, and I asked her if I was to understand she was going to make a full assignment of the dower to me, that I would have all the rights to it. She said, ' That is exactly what I intend to do.' I said, ' Under those conditions, then, I will agree to it.' She said, ' Very well, I thank you, very much obliged to you, and so forth, and I will have the assignment of the dower made out.' Q. Now, did she on that occasion say anything relative to    *    *    * whether you had a lawyer or not? A. Yes. Q. What did you say to her? A. I told her I had not. Q. What did she say? A. Then she said, ' I will have my lawyer make them up.' "

The third visit made by plaintiff at Hosier's office was on November 22, 1909, about midday. What took place is thus narrated by him: " Q. Now, when Mrs. Conlon came on this occasion, about November 22d, did the gentleman that was with her accompany her into your private office? A. He did not. Q. As you came up one flight of stairs in your building, you entered into a large room in which partitioned off was your private office? A. Exactly. Q. Now, then, did Mrs. Conlon come into your private office on that occasion? A. Came directly into my private office. Q. Did any gentleman come with her? A. He did not. Q. And when she came into your private office, just recall as nearly as you

can what she said and what she did and what you said.   A. She had this envelope with her and said, ' Here are the papers, the assignments.'   And I took them from the envelope and looked at them and I said, ' Is this a full assignment?'   She said, ' It is a full assignment of all my dowry to you, Mr. Hosier.'   Q. Now, then, when you say you looked at them, do I understand that you read them through?   A. No, sir. Q. What do you mean by that?   A. I opened them — they were folded and in this envelope, and I opened them, turning them over casually, and saw that they bore signatures, and folded them up again and probably laid them on the edge of the desk.   Q. Did you see her signature?   A. Yes.   Q. How many papers were in the envelope that she delivered to you? A. Three.   Q. And after Mrs. Conlon left · that day what did you do with this envelope and the three papers?   A. Put them in my safe, put them back in the envelope and subsequently put them in my safe."

The three papers in question were (1) the assignment of dower, plaintiff to Marsh; (2) the assignment of dower, Marsh to Hosier; (3) plaintiff's affidavit of title.   Hosier delivered them in November, 1911, to Emley, when the assignments were recorded.   After the transaction in Hosier's office was concluded, plaintiff said to him: " ' I have a lawyer out here, if you would like to see him.'   And I said, ' I don't know that I have any special inquiries to make; you say this is the complete assignment of the dower,' and on the way out she introduced me to Mr. Marsh.   Q. How did she introduce you?   A. Her lawyer.   Q. Her lawyer?   A. Yes.   *   *   *   Q. After the introduction, what else was said, if you remember?   A. I believe I asked him if I understood this was a full assignment of Mrs. Conlon's dower to me.   He said, ' That is a full assignment.'   And he said, ' There will probably be some bills due shortly.   There was nothing due then.'   I asked him if there was any money required at that time.   He said there was none then, but shortly there probably would be some requests for payments, bills that had been contracted for."

He says that plaintiff told him that as proceedings had been started to resume the payment of dower, it was thought best to let the dower come along in her name as otherwise it would upset the proceedings, and, therefore, she would rather have

him not record the papers. The account of June 27, 1910, he explains as being a transcript of his own individual account with his firm of Rafferty & Hosier, prepared by the firm's cashier, from the entries in their private ledger. He emphatically denies any misrepresentation to plaintiff or any agreement that he held plaintiff's dower right simply as security or collateral, but claims the transfer to him was absolute.

Defendant Marsh testified that he was first retained by plaintiff in November or December, 1907, in connection with the forged deed to No. 121 Worth Street involved in the suit of *Harding* v. *Conlon.* He testifies: " Prior to the execution of these papers; in fact, during the time that I was acting as Mrs. Conlon's attorney, I had urged upon her from time to time the necessity of getting funds for her defence in this litigation of Harding against Conlon, and it finally came to a point where I told her that she would have to get funds to take care of the expenses of the litigation and to prepare for the future, that she would have to have expert trial counsel and that there was then due or incurred expenses for a reference and taking the testimony of one Anderson who was to be a witness in the case of Harding against Conlon. Q. Up to this time had you ever seen Mr. Hosier, the defendant in this case? A. No, sir, never saw him. Q. Had Mrs. Conlon, so far as you can recall, mentioned his name to you up to that time? A. No, sir. Q. Now what is the next occasion that you recall any conversation with Mrs. Conlon relative to that matter? A. Shortly after that, I couldn't say how long, at her apartment I had a conversation with her. * * * Q. Now state what it was. A. Mrs. Conlon came to me and said ' I have made arrangements to obtain money. I have agreed to sell my dower to Mr. Hosier, and he has agreed to pay any ' and all disbursements which may be necessary to carry on my defense in the Worth Street litigation to a finish,' was the way she expressed it. I said, ' Well, what do you mean when you say you have agreed to sell your dower to Mr. Hosier?' And she said, ' I have agreed to turn over to Mr. Hosier all my dower rights in three pieces of property.' I said, ' You can't do that without my father's consent. You told me that you had agreed to give my father the dower in consideration of the Buffalo lots which had been deeded to you, and you are in no

position to sell the dower to Mr. Hosier unless you get his consent.' She said, ' What will I do?' I said, ' You had better see him and see if you cannot make such an arrangement with him, carry out your arrangement with Mr. Hosier.' And she said she would do so, and that if she could make such an arrangement she would want me to draw the papers for her because she had told Mr. Hosier that she would have her lawyer attend to the matter. That is about all that was said at that conversation, as I recall now. Q. Now then, subsequent to that did you see Mrs. Conlon again? A. I did, a day or so after that. Q. What did she say on that occasion? A. She said that — she saw me and she said that she had seen my father and had made a satisfactory arrangement with him. It was all right to go ahead and draw the papers. Q. Did she tell you what, in substance, the arrangement was? A. Why, I said, ' What arrangement have you made with him?' And she said, ' Well,' she says, ' I have agreed to give your father an interest in the Worth Street property, and he has agreed to turning over the dower to Mr. Hosier, and he is willing to sign any papers which will carry that arrangement out.' And I said, ' Then there is no formal assignment from you to my father. I suggest that you make such an assignment which will recite the Buffalo lots as the consideration '— the Buffalo lots which had been deeded to her, and that another assignment be made from my father to Mr. Hosier so that the chain of title from Mrs. Conlon to my father and from my father to Mrs. Conlon would be complete. Q. Your father to Mr. Hosier? A. My father to Mr. Hosier — would be complete; and she said, ' All right, fix it up that way.' "

Plaintiff told Marsh to get the papers ready for execution by Marsh, Sr., and herself, and he did so. He never saw or conversed with Hosier till after the papers were actually delivered to him. He described in detail how he prepared the papers, both as to typewriting and attaching together the sheets in the assignment to his father, which contained the full description of the property. He says certain blanks were filled in at his office 50 Broadway, from information given him by plaintiff and that she then signed the assignment and affidavit in the presence of Marsh, Fasola, and Miss Edwards, and that she acknowledged its execution to Fasola. He says

his father came in later, while plaintiff was still there and signed the paper and acknowledged it before Fasola in the latter's office. He swears he never met Hosier till he was introduced to him by plaintiff after the papers had been delivered to Hosier. This then took place: "Q. When you were introduced to Mr. Hosier, what further was said, if you remember? A. Why, he asked me, as I recall it, whether the papers were all right, and I said yes. I said, 'They give you a clear title to the dower rights of Mrs. Conlon, which I understand is in accordance with your agreement with her?' And then I suggested that the assignments be not recorded for the present anyway, as it would only make unnecessary trouble and might create confusion. I told him there was some action pending at that time which would affect the manner in which the dower was to be paid, and if he recorded it, he would have to be made a party to the litigation; that is about all I recall at that time. There was a word or two in general said; Mrs. Conlon and I left."

He swears the papers he prepared are those now in evidence; that he never prepared an assignment direct from plaintiff to Hosier either as security, collateral or otherwise. He never told plaintiff that the papers as drawn were only a security or collateral for advances to be made. He swears that his father in January, 1912, was seventy-three to seventy-four years of age and in a highly nervous condition, suffering from cerebral hemorrhage from which he died the following October. At the request of his father he sent the following letter:

" *January* 2, 1912.

"Mr. THOMAS M. MULRY,

"Receiver of premises 121 Worth St.,

"51 Chambers St., N. Y. City:

"DEAR SIR.— Please take notice that by virtue of an assignment duly made and executed by Mrs. Eva K. Conlon, I am the owner of the dower and right of dower in premises No. 121 Worth St. of which John P. Conlon, her husband, died seized.

"All future payments of said dower you will please make to me.                                        Respectfully yours,

"JAMES H. MARSH,

"120 Liberty St., Room 810, N. Y. City."

"*January* 2, 1912.

" LAWYERS TITLE INSURANCE & TRUST CO.,

"Broadway, New York City:

"GENTLEMEN.— You will please take notice that by virtue of an assignment duly made and executed by Mrs. Eva K. Conlon, I am the owner of the dower and right of dower to which said Eva K. Conlon became entitled upon the death of her husband, John P. Conlon, in certain premises situated in the City of New York, and known by the following street numbers namely,

"121 Worth St.

"39 Mott St. and

"323 W. 16th St.

"Under a decree of the Supreme Court, the owner of the 16th St. and Mott St. premises, is, through your company, paying the dower to Mrs. Conlon. All future payments will be payable to me and not to Mrs. Conlon, by virtue of the above assignment.

"Respectfully yours,

"JAMES H. MARSH,

"120 Liberty St., Room 810."

"NEW YORK, *January* 24, 1912.

" LAWYERS TITLE INSURANCE & TRUST CO.,

' 160 Broadway, New York City:

"GENTLEMEN.— Replying to your favor of the 22d instant, relating to the dower of Mrs. Eva K. Conlon, would say that neither Mrs. Conlon nor Mr. Hosier, to whom you refer, has any interest whatever in the dower in the premises known as the Mott Street and 16th Street properties.

"The assignment made to Mr. Hosier and recorded on November 24th, 1911, in L. 137, Sec. 1 of conveyances, page 163, was given to him merely to cover certain advances. These advances have now been fully paid and Mr. Hosier's interest in the dower has ceased.

"Within a short time I will have the record straightened out or will institute an action, so that the rights of all parties concerned will be determined.

"Respectfully yours,

"JAMES H. MARSH."

First Department, January, 1920.          [Vol. 190.

He swears he himself had no personal interest in the dower; that there were transactions concerning real estate in which his father was interested, but his name never appeared, as all the affairs were conducted in the name of dummies, one of whom was plaintiff, representing his father; that his father was the equitable owner of the lots at Buffalo and Tonawanda transferred to plaintiff, and that the value of his equity was $25,000 to $30,000. He understood that his father caused this equity to be transferred to plaintiff by the " dummies " representing Radford and Cohen, in consideration of plaintiff's oral promise to transfer to him her dower in the Conlon property. He claims that plaintiff told him that she had made some arrangement with his father by which the latter was to have an interest in the Worth street property in return for his conveyance to Hosier of the dower rights.

Mrs. Helen M. Marsh, mother of the defendant James H. Marsh, testified that her husband, James H. Marsh, died in October, 1912. She identified her husband's signature on his account with her in the Broadway Trust Company. She says her husband's handwriting changed a great deal before he died; that her son's and husband's handwriting were very much alike, but the signature to the assignment from Marsh to Hosier looked very like her husband's writing.

George D. MacKay was called to give testimony which demonstrated the unreliability of Banker as a witness.

Louis S. Quimby, formerly paying teller of the Broadway Trust Company (at the time of the trial its vice-president), familiar with the signature of Marsh, Sr., swore that in his opinion the assignment, Marsh to Hosier, was signed by him. The signature on opening the account and various checks, all signed by Marsh, Sr., were all present for comparison and opinion.

J. Clifford McChristie was called to identify certain checks.

George W. Berry, receiving teller of the Broadway Trust Company, familiar with the signature of James H. Marsh, Sr., testified that the signature to the assignment, Marsh to Hosier, was that of Marsh, Sr.

David Steckler, plaintiff's attorney, called as a witness by defendant, conceded that in the action of Steinman and Meyers against Conlon he had charged that the assignment

of dower was a fraud on creditors and that she had given a false address and that he had made efforts to locate her for a year. He gave other evidence not necessary now to review.

Jay Noble Emley, an attorney, also gave testimony which it is not deemed advisable now to discuss.

In the foregoing statement of facts, reference to the disgraceful record in the long course of Steinman and Meyers litigation with plaintiff has not been detailed as in our view it is not necessary to the decision of the case.

The learned court first handed down an opinion, in which he said that " the voluminous testimony and exhibits disclose a farrago of chicane, fraud and perjury, involving not alone the acts of Mrs. Conlon and the defendant Hosier, but as well the professional conduct of three members of the Bar." He dismissed the complaint as to the defendant James H. Marsh on the ground that he was neither a proper nor a necessary party. He found: " (1) The assignment of dower (Exhibit 8) from Eva K. Conlon, plaintiff, to James H. Marsh, dated November 22, 1909, and as well the assignment of dower (Exhibit 9) from James H. Marsh to defendant Edward B. Hosier, were severally executed by the plaintiff as her free acts and deeds. Each, as it imports upon its face, was absolute in form and was so known and intended by plaintiff to be at the time of its execution and also at the time of its delivery to defendant Hosier, and neither of the assignments was either in form or substance or in fact executed or delivered because of any misrepresentation whatsoever by James H. Marsh. (2) The James H. Marsh named in each of the assignments was this defendant James H. Marsh and not his father, who bore the same name. (3) The assignment from plaintiff to Marsh was without any consideration whatsoever and was made in pursuance of an understanding between plaintiff and Marsh that he would forthwith assign the dower to Hosier. (4) On or about November 23, 1909, both of said assignments were by the plaintiff delivered to the defendant Hosier as collateral security for certain loans thereafter to be made by him to the plaintiff. Thereafter Hosier loaned plaintiff certain moneys on the faith and security of the several assignments. (5) At various times in the year 1911 and thereafter, but prior to the commencement of this action,

and in various actions and proceedings wherein creditors of the plaintiff were pursuing her, seeking to reach her said dower interest and to enforce their claims against the same, the plaintiff, aided and abetted by Hosier, and for the purpose of hindering, delaying and defrauding plaintiff's creditors, repeatedly, in verified pleadings, affidavits and otherwise, represented and made it appear to said creditors, to this court and to those persons through whom payments on account of said dower were to be made, that said dower interest had been sold to Hosier for a valuable consideration and that said several assignments were in fact absolute and not conditional and as collateral security for said loans, and that they had been delivered to Hosier as muniments of his indefeasible title to said dower. It follows from the foregoing that there must be judgment for defendant Hosier, but without costs." (97 Misc. Rep. 506.) Application for a reargument having been granted, the court some six months later filed a second opinion, in which he reaffirmed his finding that " the assignments to Hosier were not absolute, but were to secure moneys to be loaned;" that the plaintiff did not come into court " with clean hands," and was " *in delicto*, not by reason of an originally fraudulent assignment of her dower, but by reason of subsequent sworn statements intended to deceive her creditors, by making the assignment appear to have been absolute when in fact she was the equitable owner. These falsehoods the defendant Hosier in no way influenced. On the other hand, Hosier has knowingly connived with Emley, Mrs. Conlon's attorney, in a scheme to take advantage of Mrs. Conlon's fraudulent acts." The court thought, therefore, that plaintiff could not be regarded as " *in pari delicto* " with Hosier. He further said: " Had it been Emley's only purpose to benefit Hosier at the expense of Mrs. Conlon, and had Hosier been innocent of participation in the fraud, otherwise than by acceptance of its fruits, I think the public policy under which the courts are vigilant to protect the relation of attorney and client and prevent the abuse by an officer of the court of his position of trust and confidence would require that plaintiff be given relief against Hosier. See *Goodenough* v. *Spencer*, 46 How. Prac. 347.

" But plaintiff's position is even stronger under the facts as I find them to be. Emley's position is not that of an attorney who unscrupulously, but disinterestedly, assists the equally guilty parties to an assignment in using it to defraud creditors of one or both of the parties. On the contrary, he conceived and engineered the fraud, first making use of it to defeat the creditors of Mrs. Conlon, and then to invest Hosier with complete legal title to the exclusion of his other client, Mrs. Conlon. In fact, as I have already pointed out, it would not be a violent assumption that it was Emley's ultimate purpose to secure the dower for himself alone. However this may be, it is perfectly clear that his intent was at least to appropriate so much of the dower money as he should be able to exact under the guise of professional fees. He used Hosier as a mere instrument in the accomplishment of his purpose. Emley, therefore, although not a party defendant, is the one to whom controlling importance is to be attributed in applying the doctrine of clean hands, and it is the degree of his guilt that is significant rather than Hosier's. Regarding Emley as the chief actor in the scheme to defraud the plaintiff as well as her creditors, it is obvious that Mrs. Conlon is not *in pari delicto.*"

Thereafter the court filed a third opinion. In his decision he made the following findings:

" III. On November 22, 1909, there was due and owing to the plaintiff and unpaid under said decree the sum of about $3,000 as dower, and on or about said date the plaintiff entered into an agreement with the defendant Hosier, wherein he agreed to loan and advance to the plaintiff divers sums of money as she might require in the prosecution of certain legal proceedings which were then pending in this court in the said action of Conlon against Kelly and in a certain other action then pending in this court wherein Winifred Harding and others were plaintiffs, and the plaintiff herein was defendant, and the plaintiff herein agreed to secure the payment of said advances by an assignment of said dower unto said defendant Hosier.

" IV. The plaintiff thereupon instructed the defendant Marsh, who is an attorney of this court and at said time was

plaintiff's attorney in said actions, to prepare the necessary papers to effect such transfer. Thereafter on the 22d day of November, 1909, the plaintiff, intending to make a conditional assignment of her dower to Hosier as security for advances to be made by Hosier as hereinbefore mentioned, signed an instrument prepared by Marsh and which Marsh represented to be, and which the plaintiff in reliance upon Marsh believed to be, designed to effect such an assignment. At or about the same time, the plaintiff also signed a paper in the form of an affidavit, in which she stated the amount then due her on account of said dower. Marsh retained the said assignment and form of affidavit in his possession, and thereafter and on or about the 25th day of November, 1909, accompanied the plaintiff to the office of Hosier and thereupon gave to the plaintiff for delivery to Hosier, and the plaintiff delivered to Hosier, an envelope containing instruments, which plaintiff in reliance upon the representations of Marsh believed to be the instrument or to include the instrument signed by her as hereinbefore stated, and which the plaintiff likewise believed to be designed to effect a conditional assignment to Hosier to secure advances to be made by Hosier as hereinbefore mentioned. The instruments in fact contained in said envelope and delivered to Hosier were (a) an absolute assignment in writing of plaintiff's dower by the plaintiff to the defendant Marsh bearing date November 22, 1909, for the alleged and pretended consideration of the conveyance to the plaintiff on July 1, 1908, of certain lands in Erie county, (b) an absolute assignment executed by Marsh and dated November 22, 1909, assigning said dower to Hosier for the pretended consideration of one dollar and other valuable considerations, and (c) the form of affidavit signed by the plaintiff and hereinabove mentioned. The said two absolute assignments were prepared by Marsh. Marsh caused one Fasola, a commissioner of deeds, to attach his signature to a jurat affixed to the said form of affidavit, and also to an acknowledgment attached to the said assignment from the plaintiff to him, but the plaintiff never made oath to said affidavit before said Fasola, nor did she appear before him and acknowledge said assignment. The plaintiff was ignorant of the contents of the said envelope excepting the said form of

affidavit, and was ignorant of the existence of the said two assignments. Her signature to the first of the said two assignments and her delivery of both assignments to Hosier were fraudulently procured by Marsh.

" V. No consideration of any kind existed or passed from the defendant Marsh to the plaintiff for the said assignment by the plaintiff to the defendant Marsh, and no consideration of any kind existed or passed from the defendant Hosier to the defendant Marsh for the assignment by the defendant Marsh to the defendant Hosier.

" VI. Neither the plaintiff in thus assigning her dower, nor the defendant Hosier in accepting said assignments, intended thereby to hinder, delay or defraud creditors or prospective creditors of the plaintiff.

" VII. That the defendant Edward B. Hosier did not at the time or prior to the time of the delivery of said written instrument of assignment of plaintiff's dower rights to him, as set forth in the plaintiff's complaint herein, induce the plaintiff to either sign, execute or deliver said instrument to him by any false or fraudulent representations whatsoever.

" VIII. That the defendant Edward B. Hosier did not at the time or prior to the time of the delivery to him of said written instrument of assignment executed by the said James H. Marsh, induce the plaintiff to either cause to be signed or executed or to be delivered to him said written instrument of assignment by any false or fraudulent representations whatsoever."

The court, it will be seen, found defendant Marsh guilty of fraud in the procuring of the assignments from plaintiff who had misrepresented them, though in his original opinion he had said that plaintiff knew the paper executed by her was absolute in form and was so intended, and that " neither of the assignments was either in form or substance or in fact executed or delivered because of any misrepresentation whatsoever by James H. Marsh."

Many of the findings are taken up with the alleged fraudulent acts of Jay Noble Emley, attorney for both plaintiff and Hosier (who was his brother-in-law). He was first consulted professionally by plaintiff in May, 1911, and was retained by her in writing on June 9, 1911, to defend her in the suit of

*Harding* v. *Conlon,* and in future litigation necessary to protect her rights in that property under the deed (since declared to be forged). He had no connection with the execution of the assignments in question, and did not represent plaintiff till a year and a half after the transaction between plaintiff and Hosier culminated in the execution and delivery as prepared by Marsh. The decision sets forth at great length the acts of Emley during the efforts to enforce the Steinman and Meyers judgments, by which it is claimed that he instigated, counseled and advised a fraudulent use of the assignments for the two-fold purpose of " hindering and delaying said creditors, and at the same time to preserve and protect the said dower from attack by said creditors so that said Emley could resort to the same for the purposes of the prosecution of said appeal " in *Harding* v. *Conlon;* that plaintiff had great confidence in Emley and put great dependence upon him, and that in making false and fraudulent representations to her creditors and using the assignment for that purpose in the ways enumerated in the findings, she was instigated, counseled and advised by Emley; that she did not resort to such fraud of her own initiative, but under the control of Emley, who advised her to make a fraudulent use of the assignment, not only to defraud her creditors but also to further his own interests, to enable him to collect disbursements and fees. I have not deemed it necessary to set forth the various fraudulent acts claimed to have been committed in connection with the Steinman and Meyers judgment and the lengthy litigation which arose therefrom. Concededly when defendant received the assignments from plaintiff, he knew nothing about the Steinman and Meyers claim nor does plaintiff claim to have told him thereof. But the discussion of the evidence in connection with the Steinman and Meyers litigation is unnecessary because of the conclusion reached by me as to the actual agreement between plaintiff and Hosier, and it is inadvisable as the details of the litigation may be the subject of judicial investigation concerning the conduct of some or all of the attorneys concerned, and the matter will then come before this court in the regular manner.

I am of the opinion, upon this record, that the agreement between plaintiff and Hosier was that Hosier agreed to advance plaintiff the funds necessary to carry on the litigation affecting

her right to dower in No. 39 Mott street and No. 321 West Sixteenth street, such advances to be made from time to time without any promise on the part of plaintiff to repay same and that in consideration of such advances so to be made, the plaintiff agreed to convey and did convey her dower right in said premises to the defendant Hosier absolutely.

Plaintiff now claims that the transfer to Hosier was valid in its inception and made without intent to defraud creditors; that it was collateral only, but that she subsequently used it for the purpose of evading her pursuing creditors by urging that the transfer was in fact absolute, as its form indicated, and that Hosier, then kindly disposed towards her, assisted her in so misrepresenting the nature and purpose of the transfer, these misrepresentations being made in the supplementary proceedings in Steinman and Meyers against Conlon. She admits that at the time she sought help from Hosier her position was as follows: She had received no dower since February, 1908, and could not prosecute her appeal from the order on the Buttenwieser motion ending her right to dower; she had no money to print the papers on appeal and was in default thereon, whereupon an order was made dismissing her appeal, but on application to this court leave was granted her to prosecute the appeals. Anderson, the witness who was claimed to have taken the acknowledgment of Conlon to the (forged) deed involved in *Harding* v. *Conlon*, was in a hospital and about to die; plaintiff needed funds to take his testimony, which was vital to her defense; Marsh had told her she should get counsel to protect her interests; she was earning $10 to $12 a week only. It is her contention that after applying to a friend, she was sent to Hosier's wife, then to Hosier, and that he agreed to make the advances necessary to print the case on appeal from the order on Buttenwieser's motion and to pay the costs for taking Anderson's deposition, and such other disbursements as she might need, and that as security or collateral for such advances Hosier received the assignments in question. She claims that Hosier was paid back in full by June 27, 1910, and thereafter he acted by agreement as a sort of banker for her, receiving and cashing her dower checks and making disbursements therefrom as she required from time to time. She admits that when the assignments were made she was liable on the Steinman and

Meyers claim but was not insolvent; and claimed that in November, 1909, there was $2,500 of back dower due her, and as she was then forty years of age, with an expectancy of life of eleven and sixty-six one-hundredths years, the present value of her dower right was $17,356. All this is urged as showing the improbability of her having agreed to transfer her dower rights absolutely.

Defendant Hosier's contention is that at the time she called upon him she was in a desperate situation. He puts it as follows: Mrs. Conlon was in a desperate situation. She was without any income whatever except her personal earnings of from ten dollars to twelve dollars per week. The action to declare the deed to the Worth street property a forgery was pending. The Steinman and Meyers action against her had just been commenced. Her attorney was urging her to raise funds and employ new counsel in connection with the pending litigations. She had no real defense to the Steinman and Meyers action and a judgment against her therein would result in her dower rights being reached and taken by her creditors. On the other hand, she must have available funds to fight the Worth street litigation through the Court of Appeals, if necessary. If she were beaten in that suit, she would lose the Worth street property. The only valuable available thing she had on which to secure funds sufficient to fight the Worth street litigation was her dower right. If the Steinman and Meyers action against her were prosecuted to judgment her dower rights were in jeopardy and her ability to secure funds to fight the Worth street litigation would be destroyed. She, therefore, stood to lose both her dower rights and the Worth street property. Her greatest present need was sufficient funds to enable her to protect her interests in the pending litigation. Hence, it is contended, plaintiff decided to cast her dower rights into the scale of chance in such a way that her creditors could not reach them and at the same time assure herself of a source of supply which would meet every necessary disbursement in her fight to retain title to the Worth street property. Hence, also, her agreement with Hosier and the absolute transfer of the dower right to him, she taking care not to advise him of the action then pending against her brought by Steinman and Meyers.

The credible testimony in the case all seems to me to sustain the contention of Hosier that this transfer to him was intended to be, as it was in fact, an absolute one. He advanced the moneys on plaintiff's behalf as he agreed to do, and there is no claim that he ever defaulted or failed to keep his agreement. He was guilty of no fraud or bad faith towards plaintiff. He made no false representations to her and practiced no deceit on her. He accepted the papers she tendered him, transferring her dower to him. He never agreed to keep the papers off the record, but did withhold recording them for a time, for her benefit. He gave her a transcript from his firm's ledger, showing the state of his account with his firm in regard to receipts and disbursements made by his firm for him in relation to the Worth street transaction, as his account was kept by his firm, but he never rendered her any account showing the condition of his dealings with her, or a balance due to her; she never was entitled to such an account, having no further interest in the dower or in his disposition of it. He never acted as her banker by any agreement or otherwise. He has asserted his right to absolute ownership of this dower, as he had a right to do, and I find nothing in the case warranting any charge of fraud, deceit or dishonesty against him.

The Worth street property, to which plaintiff was asserting absolute title under the deed attacked in *Harding* v. *Conlon,* was valuable. It was taken in condemnation proceedings at the price of $68,000. The mortgage upon it was $25,000, leaving an equity of $43,000. The gross income from this property was $3,600; the net $2,074. There is nothing improbable in the theory that plaintiff risked her dower right of $1,504.81 annually, knowing it was in danger in part from the order in the Buttenwieser motion and in whole from the Steinman and Meyers valid claim, in order to stake all on the chance of getting title to the Worth street property and thus give her an equity of a comparatively large amount, convertible into ready cash. For one struggling along on $10 to $12 a week a considerable amount in ready money was a great inducement even to such a speculation, whereby she risked a certainty of an annual payment (only certain at its full amount, however, if the order in the Buttenwieser motion was reversed) for a large present payment. She knew, as well,

that she ran serious risk of unpleasant consequences if the deed to her of Worth street was discovered to be a forgery, but she may well have counted on a vigorous defense to the Harding suit resulting in a complete victory for her. Whatever the motives impelling her may have been, she did transfer absolutely her dower rights to Hosier. And while the act may later have seemed to her to be improvident, she cannot now be relieved from her deliberate act, when no fraud was practised to induce her to carry out her own deliberate purpose.

Claim to ownership of the dower rights was made in writing on January 2, 1912, by Marsh, Sr., to the Lawyers Title Insurance and Trust Company, to whom the statement was later made (January 24, 1912), in writing by Marsh, Sr., that neither plaintiff nor Hosier had any interest whatever in the dower rights, as the transfer to Hosier was given merely to secure certain advances which had been fully paid and Hosier's interest in the dower had ceased. These letters were not sent with any knowledge on the part of Hosier; they were not then communicated to him; he had no knowledge of such a claim being made. Whatever the motive which prompted the making of the demand, or the statements contained in the letters, is a matter to be explained by Marsh, Sr., and his attorney, not by Hosier. Singular as the story may at first seem about the property at Buffalo and Tonawanda, and lacking as it is in many details because of the death of Marsh, Sr., I am convinced upon this record that Marsh, Sr., did in fact execute the reassignment of the plaintiff's dower rights to Hosier; that he was interested in the property at Buffalo and Tonawanda transferred to plaintiff; that it was so transferred to her at his direction by the " dummies " employed in the real estate operations; that he had dealings with plaintiff; and that when the transfer of her dower to Hosier was first broached to defendant Marsh he insisted that some settlement be made with his father, who claimed to have an oral agreement with plaintiff for the transfer to him of those same rights; and that some arrangement between plaintiff and Marsh, Sr., was in fact made, is evidenced by his receiving the assignment and executing the reassignment. The testimony of disinterested witnesses as to the signature of Marsh, Sr., appearing on the reassignment must be accepted as conclusive on that point. What the value was of the con-

sideration which plaintiff received from Marsh, Sr., whether $25,000 or much less, and what the agreement was between them by which he surrendered any rights he may have claimed to receive by a transfer of plaintiff's dower rights, are matters quite immaterial. No claim is asserted in this action of any right, title or interest in the dower rights on behalf of the representatives of Marsh, Sr., or by defendant Marsh, nor does it appear how such a claim could be consistently or safely urged.

It may be noted that the commissioner before whom the acknowledgment of both assignments purports to have been taken, John B. Fasola, has left the city and his whereabouts could not be ascertained. The subscribing witness to the transfer from plaintiff to Marsh (Miss Edwards) was located in the State of Washington, but application for leave to go to Special Term and move for a commission to take her deposition made by defendant Hosier upon the trial was denied by the court.

Plaintiff clearly failed to make out her cause of action as alleged. Her denial that she ever knowingly signed the assignment to Marsh, and that what she did in fact sign was a transfer to Hosier as security only, is without credible evidence to support it. She has proved no fraud, deceit or misrepresentation upon the part of defendants. As against clear and convincing evidence, supported by documentary proof and with many written declarations by her to a like effect, that the transfer to Hosier was intended by her to be absolute, she can offer only suspicion, surmise and speculation. There is no proof of any fraud upon her in the execution of the assignments. She got what she wanted, financial help for her litigation in a desperate crisis of her affairs, and the price she paid for it was what she herself offered to pay.

It will be evident that having reached the conclusion that the plaintiff's transfer to Hosier was absolute, there could be no way in which the alleged fraudulent acts of Emley or any one else could have operated to change its character into one simply given as security or collateral. But if a different conclusion had been reached, and we had found that the transfer was one given simply as security or collateral, there would have been no difficulty in determining that plaintiff had no standing in a court of equity, and was barred by her own acts from any relief

in this action. For if the transfer to Hosier was simply given as security, then even if acts of fraud had been committed by him, Emley, Marsh or any other person after the original transfer, they were done by understanding with plaintiff, with her full assent and knowledge, with her active co-operation therein, and solely for her benefit to enable her to hinder, delay or defraud her creditors. The plaintiff, if her theory of the nature of the transfer made by her to Hosier could have been established by adequate testimony, would have been in the position that she did not come into a court of equity with clean hands, for the subsequent alleged fraudulent acts (if she had established them) would have been committed to inure to her benefit, at the expense of her creditors. Having in view her record of litigation and the characterization of her by the justices who passed on various phases thereof, it would be taxing credulity to ask any court to believe that she was dominated by her attorney or that any fraudulent conduct on her part was directed and supervised by him or by any one else.

It follows that as to the defendant Hosier the judgment appealed from should be reversed, with costs, and judgment entered in his favor dismissing the complaint of the plaintiff herein as to him.

As to the defendant Marsh, the court dismissed the complaint, but without costs, and made findings finding him guilty of fraud. The dismissal was upon the ground that he was not a necessary or proper party to the action. As it was necessary for him to appeal in order to secure a review of the determination that he had been guilty of fraud, the findings that he had been guilty of fraud will be reversed, and he should have the costs of this appeal as against plaintiff.

The following findings of fact contained in the decision herein are hereby reversed: III, IV, V, VI, IX, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XXI, XXII, XXIII, XXIV, the entire third sentence of XXV, XXVI, XXVII, XXVIII, XXIX, XXXI, XXXII, XXXIII, XXXIV.

The following conclusions of law contained in the decision are also reversed: I, II, III, IV.

The following findings of fact proposed by defendant Hosier are found: Second, third, fourth, fifth, sixth, seventh, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, six-

teenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-first, twenty-second, twenty-third, twenty-fourth, twenty-fifth, twenty-sixth, twenty-seventh, twenty-eighth, twenty-ninth, thirtieth, thirty-first, thirty-second, thirty-third, thirty-fourth, thirty-fifth, thirty-sixth.

Also the following conclusions of law proposed by said defendant Hosier: First, second, third, fourth, fifth.

The following findings of fact proposed by defendant Marsh are also found: First, second, fourth, fifth, sixth, seventh.

Also the conclusions of law proposed on behalf of said defendant Marsh, numbered first and second.

Judgment will be entered in accordance herewith.

CLARKE, P. J., LAUGHLIN, PAGE and MERRELL, JJ., concur.

Judgment dismissing complaint as to defendant Marsh affirmed, and the finding that said defendant had been guilty of fraud reversed, with costs of this appeal to said defendant. Judgment as to defendant Hosier reversed, with costs, and complaint dismissed as to said defendant, with costs. Settle order on notice.